[Cite as *State ex rel. Dewine v. Titan Wrecking & Environmental, L.L.C.*, 2012-Ohio-1429.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO, ex rel. MIKE DEWINE        :

    Plaintiff-Appellant                          :                  C.A. CASE NO.     24661

v.                                                          :                  T.C. NO.     08CV10301

TITAN WRECKING & ENVIRONMENTAL,    :              (Civil appeal from
LLC                                                                               Common Pleas Court)

    Defendant-Appellee                         :

                                                :

            . . . . . . . . . .

**O P I N I O N**

Rendered on the     30th     day of     March    , 2012.

            . . . . . . . . . .

WEDNESDAY M. SZOLLOSI, Atty. Reg. No. 0075655, Assistant Attorney General, One Governmental Center, Suite 1340, Toledo, Ohio 43604 and GREGG H. BACHMANN, Atty. Reg. No. 0039531, Assistant Attorney General, 30 East Broad Street, 25th Floor, Columbus, Ohio 43215
      Attorneys for Plaintiff-Appellant

RONALD J. KOZAR, Atty. Reg. No. 0041903, Kettering Tower, Suite 2830, 40 N. Main Street, Dayton, Ohio 45423
      Attorney for Defendant-Appellee

            . . . . . . . . . .

FROELICH, J.

    **{¶ 1}**    The State of Ohio appeals from a judgment of the Montgomery County

Court of Common Pleas, which concluded after a bench trial that Titan Wrecking and Environmental, LLC, did not improperly handle asbestos-containing materials during the course of removing floor tile from Cleveland Elementary School prior to demolishing the building. For the following reasons, the trial court's judgment will be affirmed.

I.

{¶ 2}    At the State's request, the trial court issued findings of fact and conclusions of law. The trial court made the following findings of facts, which we find are supported by the record.

{¶ 3}    In 2003, the Cleveland Elementary School on Pursell Avenue in Dayton was being demolished as a part of the Dayton Public Schools rebuilding program. Cleveland Elementary School had stood for decades, and many additions had been made over the years. The school was being demolished to make way for the construction of a new Cleveland Elementary School. The school district contracted with Titan to demolish the building.

{¶ 4}    In conjunction with the Cleveland Elementary School demolition, Dayton Public Schools contracted with other contractors, including an asbestos abatement contractor. The asbestos abatement contractor was to perform its work prior to Titan completing the demolition. The asbestos abatement contractor was Helix Environmental and its representative was Ralph Froehlich. Helix finished its work in late November or early December of 2003.

{¶ 5}    On December 3, 2003, Titan filed a Notification of Demolition and Renovation with the Regional Air Pollution Control Agency ("RAPCA"), the local air

pollution control authority charged by the Ohio Environmental Protection Agency ("Ohio EPA") with enforcing United States Environmental Protection Agency ("EPA") rules and regulations for the Clear Air Act, including asbestos regulations. Titan submitted the demolition notification on the prescribed EPA form and indicated its plan to remove 12,000 feet of vinyl floor tile prior to demolition of the Cleveland Elementary School building; the notice indicated that the flooring contained non-friable asbestos. Titan intended to remove the floor tile in order to recycle the concrete floors.

{¶ 6} Titan used a "bobcat" with rubber tires and a shovel-type device attached to the front to scrape the floor tile off the concrete floor. In the process of removing this floor tile from the concrete floor, the tile broke or cracked in pieces. Some of the floor tile broke into large pieces and other pieces of tile broke into small pieces. The floor tile was also mixed into piles with other debris that came from the ceiling and walls of the school building. Some of the walls were constructed out of plaster and some of concrete or ceramic, brick or block. There were also components of the structure made of wood. During the demolition, all of this material was broken and damaged. The remnants were pushed into large piles; some piles were outside the building, others were inside.

{¶ 7} In early December 2003, RAPCA received a complaint about Titan's demolition activities. Sarah Sink-Gostomsky of RAPCA inspected the demolition site on December 15, 2003. She observed removal activity underway and saw the piles of debris. She observed that there were no water trucks, hoses or sprayers. She saw damaged floor tiles of many different sizes and observed that the tile was cracked and in many pieces. Sink-Gostomsky took several photographs of the floor tile and debris piles.

{¶ 8} Sink-Gostomsky felt the edges of the tile; she did not put the pieces into a plastic bag and apply hand pressure to them within the bag to determine if they would

crumble, become pulverized, or be reduced to powder. She concluded, simply by rubbing the edges, that there was a release of asbestos fragments into the air. She further concluded that the floor tile was extensively damaged and thus had become friable. In her view, the asbestos material was subject to regulation. In her reports regarding the inspection, Sink-Gostomsky did not indicate that the floors had been subject to sanding, grinding, cutting or abrading. However, she drew a conclusion, from visual observation, that the materials appeared to have been subjected to grinding. Sink-Gostomsky took three samples of the floor tile, all from the second floor of the building. These samples were ultimately sent to Data Chem Laboratories (now ALS Labs) in Cincinnati for analysis.

{¶ 9} The Ohio Department of Health ("ODH") was also advised of the possible violation of the Ohio Administrative Code with regard to asbestos emission control standards and procedures. Pursuant to that notification, Shamus Estep, a program sanitarian specialist for ODH, inspected the Cleveland Elementary School demolition site on December 15, 2003, the same day as Sink-Gostomsky. Estep observed "substantially non-intact" floor tile and took photographs of what he saw at the site. Estep did not acquire a dust sample, and he did not place the pieces or a piece of floor tile in a plastic bag and apply hand pressure to see if the tile would crumble, pulverize or be reduced to powder. He did not observe any mechanical sanding, grinding, cutting or abrading at the site, but he believed that some cutting or grinding had occurred before he arrived. Estep did not observe wetting, containment by polycritical sheeting, or negative air pressure machines. Estep collected five samples of the floor tile and sent them to Data Chem.

{¶ 10} Titan was not utilizing wetting during the removal of the floor tile. It was not using plastic sheeting on the windows or negative air pressure. Titan was of the view that all asbestos-containing materials that were subject to regulation had been removed by

Helix and that it did not have to engage in containment activities unless the resilient floor tile became friable.

{¶ 11} On March 31, 2004, RAPCA issued a notice of violation to Titan. Another contractor, Lepi, was brought in to clean up the site.

{¶ 12} Data Chem analyzed the samples provided by RAPCA and ODH and provided reports to those agencies. RAPCA had requested that its samples be analyzed using the bulk Polarized Light Microscopy ("PLM") method, which involves a visual estimation of the amount of asbestos; PLM is not especially effective with respect to bulk building materials. RAPCA did not request, and Data Chem did not do, a "point counting analysis" (which also uses a polarized light microscope), the method mentioned in the EPA regulations. ODH requested PLM analysis with point counting if the percentage of asbestos was less than ten; Data Chem analyzed the ODH samples by Transmission Electron Microscopy ("TEM"), a method which is more sensitive than a PLM analysis. Point counting is not feasible on floor tiles.

{¶ 13} Data Chem determined that all three of the RAPCA samples contained more than one percent asbestos. Data Chem found asbestos in four of the five samples submitted by ODH; two of the four contained asbestos in an amount greater than one percent. The samples submitted by the two agencies were held for about two months by Data Chem. The agencies did not request the samples be returned, so Data Chem disposed of the samples.

{¶ 14} The trial court further found:

Floor tile is a category I item under the NESHAP [the federal National

Emission Standards for Hazardous Air Pollutants] regulations. Floor tile like

roofing, packing and gaskets are considered less hazardous for the emission of asbestos fibers during demolition or renovation. If the floor tiles are in good condition and intact the danger of asbestos release is not great. Breaking a floor tile alone is not enough for fiber release.

Inspectors can use various types of tests to determine whether a category I non-friable asbestos containing material becomes friable during the process of demolition. The determination is subject to some subjectivity. It is the custom in the regulatory arena to respect a decision about friability based on visual observation and a hand pressure test. It is not uncommon for an inspector to use an edge test. Some regulators are of the view that the more edges that are exposed the greater the likelihood asbestos fibers have been released.

The edge test is not provided for in the regulations. The edge test is a different method of hand pressure. It is not something that is described in the regulations.

Over the years there has been a great deal of discussion and consideration of treatment of building material such as floor tile with respect to the danger for asbestos fiber release. At one time the regulations indicated that if these materials become broken or extensively broken, the danger of asbestos fiber release was appreciably greater, materially enhanced. So, if the floor tile was extensively broken then it would be considered friable and containment activity would be appropriate. The EPA guidance letters have indicated that the EPA is moving away from the term "extensive breakage" as the criterion for judging whether the floor tile has become or will become regulated. The EPA has employed the term "extensively damaged" as a criterion as of about 1994. "Extensively damaged" appears to mean: crumbled, pulverized or reduced to powder.

Most non-friable material, such as resilient floor tile, if in good condition, can be broken without releasing significant quantities of airborne asbestos fibers. Category l material such as floor tile and including asphalt roofing, packing and gaskets are stable items and do not present as great a hazard as other material. So, if these items are not extensively damaged, they can be left in place during demolition and no containment activity need be performed.

{¶ 15} Applying these facts to R.C. 3074.05(G) and Ohio Adm. Code 3745-20-04(A), the trial court concluded that the floor tile was not regulated asbestos-containing material ("RACM"). Although the court found that the tile contained more than one percent asbestos and implicitly found that the amount of floor tile removed exceeded the minimum regulated amount, the court concluded that the State failed to prove by a preponderance of the evidence that the floor tile was rendered friable. The court emphasized that the hand pressure test (as opposed to the edge test) had not been used and that breakage alone was insufficient to establish friability. The court further found that the floor tile did not become RACM due to cutting, sawing, grinding or abrading, stating that the State "failed to produce, in this case, evidence of cutting, grinding, sawing, or abrading." The court entered a general verdict in Titan's favor and dismissed the State's complaint with prejudice.

{¶ 16} The State appeals from the trial court's judgment, raising three assignments of error. In a cross-assignment of error, Titan argues that we should affirm the trial court's judgment on the additional basis that the State failed to prove that the floor tiles contained more than one percent asbestos.

II.

{¶ 17} R.C. Chapter 3704 governs air pollution. Asbestos is a hazardous air pollutant, and there is no known safe level of exposure. R.C. 3704.05(G) provides that "[n]o person shall violate any order, rule, or determination of the director [of the Ohio EPA] issued, adopted, or made under this chapter." The regulations concerning asbestos emission control are found in Ohio Adm. Code Chapter 3745-20. Ohio's regulations mirror those set forth in the asbestos NESHAP regulations, which are found in 40 C.F.R. 61, Subpart M. For purposes of this appeal, we are concerned with the version of Ohio Adm. Code Chapter 3745-20, effective November 2002, which the State introduced at trial as Exhibit 33.

{¶ 18} The procedures for notification, emission control, and waste disposal, as set forth in Ohio Adm. Code 3745-20-03 through 3745-20-05, apply to owners and operators of a demolition or renovation operation if there is at least a threshold amount of regulated asbestos-containing material. Ohio Adm. Code 3745-20-02(B)(1). Likewise, if a building is being renovated and the amount of RACM to be stripped, removed, dislodged, cut, drilled, or similarly disturbed exceeds a certain amount, the procedures for notification, emission control, and waste disposal apply. Ohio Adm. Code 3745-20-02(B)(4).

{¶ 19} There are four types of regulated asbestos-containing material:

(a)     Friable asbestos material;

(b)     Category I nonfriable asbestos-containing material that has become friable;

(c)     Category I nonfriable asbestos-containing material that will be or has been subjected to sanding, grinding, cutting, or abrading; or

(d) Category II non friable asbestos-containing material that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations regulated by this chapter. Ohio Adm. Code 3745-20-01(B)(11).

{¶ 20} "Friable asbestos material" is "any material containing more than one per cent asbestos by area, as determined using the method specified in Appendix E, Subpart E, 40 CFR Part 763, Section 1 Polarized Light Microscopy, that, when dry can be crumbled, pulverized, or reduced to powder by hand pressure." Ohio Adm. Code 3745-20-01(B)(21). On the other hand, "nonfriable asbestos-containing material" is defined as "any material containing more than one percent asbestos * * * that, when dry, cannot be crumbled, pulverized, or reduced to powder by hand pressure." Ohio Adm. Code 3745-20-01(B)(34).

{¶ 21} "Category I nonfriable asbestos-containing material" includes resilient floor coverings. Ohio Adm. Code 3745-20-01(B)(9). "Resilient floor covering" is defined as "asbestos-containing floor tile, including asphalt and vinyl floor tile, and sheet vinyl floor covering containing more than one percent asbestos * * *." Ohio Adm. Code 3745-20-01(B)(44).

{¶ 22} Stated simply, to be regulated under Ohio's asbestos regulations, the asbestos-containing material must meet three criteria: (1) the material must contain greater than one percent asbestos; (2) the amount of material must be at least 160 square feet, 260 linear feet, or 35 cubic feet (the threshold amount); and (3) the material must fall within one of the four categories of regulated asbestos-containing materials.

{¶ 23}   The regulations define resilient floor tile, such as was found in the Cleveland Elementary School, as a Category I nonfriable asbestos-containing material. Under the demolition and renovation regulations, as long as the floor tile was not in poor condition and was not friable, Titan was not required to remove it prior to demolition (unless the building and/or debris would be burned).   Ohio Adm. Code 3745-20-04(A)(1)(a), (E).

{¶ 24}   At trial, the State argued that Titan elected not to leave the floor tile in place during demolition.   Rather, Titan chose to remove the floor tile prior to demolition so that it could recycle the concrete to which the floor tile was attached.   The State proceeded on the theory that the vinyl floor tile was rendered friable and/or that it had been subject to grinding by Titan's removal activities and, as a result, Titan subjected itself to the emission control and disposal procedures set forth in the Ohio Administrative Code.

{¶ 25}   The emission control procedures include adequately wetting the asbestos before, during, and after the removal activity; properly packaging the asbestos-containing material, and disposing of that material at a licensed asbestos landfill.   The State presented evidence – and Titan did not dispute – that Titan did not engage in emission control procedures during its removal of the floor tile at Cleveland Elementary School.

III.

{¶ 26}   The State's first assignment of error reads:

THE TRIAL COURT ERRED AS A MATTER OF LAW IN CONCLUDING THAT THE FLOOR TILE WAS NOT REGULATED ASBESTOS-CONTAINING MATERIAL UNDER OHIO ADM. CODE 3745-20-01(42)(c) [FORMERLY OHIO Adm. CODE 3745-20-01(B)(41)].

{¶ 27} In its first assignment of error, the State contends that the trial court conflated two of the types of RACM by requiring "Category I nonfriable asbestos-containing material that will be or has been subjected to sanding, grinding, cutting, or abrading" also to be friable. The State asserts that the trial court's finding that "pieces of tile broke into small pieces" met the definition for "grinding," and the court was required to find in the State's favor as a matter of law.

{¶ 28} In its findings of fact and conclusions of law, the trial court stated, in part:

The central issue in this case is whether the floor tile was friable. To determine if the floor tile is friable one has to see if it can be crumbled, pulverized, or reduced to powder by hand pressure. It is the critical test that applies even to the alternative situation of examining whether there was cutting, sawing, grinding or abrading. It all comes down to the central question of whether these floor tiles were in such a condition that they can relatively easily be crumbled, pulverized, or reduced to powder. In that state they have a very high probability of releasing asbestos fibers into the air. In that state they present a risk to human health.

{¶ 29} As stated above, Ohio Adm. Code 3745-20-01(B)(41) sets forth four categories of regulated asbestos-containing materials. The State claimed that the Cleveland Elementary School tile was RACM as "Category I nonfriable asbestos-containing material that has become friable" and/or "Category I nonfriable asbestos-containing material that will be or has been subjected to sanding, grinding, cutting, or abrading."

{¶ 30} Asbestos-containing material is "friable" if it "can be crumbled, pulverized, or reduced to powder by hand pressure" when the material is dry. In its October 1990 report regarding comments to the proposed NESHAP regulations, the EPA considered, but

ultimately did not include, the term "broken" as part of its definition of "friable." The EPA determined that the addition of the term "broken" would create confusion and possible misapplication of the definition of "friable". (Def. Ex. F, 4-6.)

{¶ 31} Addressing the hand pressure aspect of the definition of "friable," the EPA further stated that it considered but rejected a revision to the definition to include mechanical forces expected to act on the material:

> The EPA believes, however, it is useful to distinguish between material that can be easily crumbled, etc. to a powder, i.e., friable material, and material that is normally nonfriable that as a result of the forces associated with demolition and renovation, may become crumbled, pulverized, or reduced to a powder and is therefore, capable of releasing asbestos fibers in amounts similar to friable material. Also, although nonfriable material may be broken or crumbled and capable of releasing asbestos, it does not necessarily become friable.

The EPA therefore created the term "regulated asbestos-containing material" to account for nonfriable materials that may nevertheless release asbestos fibers in an amount similar to friable asbestos-containing materials. Subsequent guidance from the EPA has also stated, for example, that "Category I materials are considered RACM only when they 'will be or have been subjected to sanding, grinding, cutting, or abrading', they are in 'poor condition' and 'friable', or the structure in which they are located will be demolished by burning." (State's Ex. 23., p.5)

{¶ 32} Ohio Adm. Code 3745-20-01(B)(41) explicitly and clearly provides four

means by which asbestos-containing material may be subject to regulation. With respect to Category I asbestos-containing material, such as floor tile, such material may be regulated if it either becomes friable or is subjected to sanding, grinding, cutting, or abrading. These are alternative means. The EPA comments and guidance documents reinforce the intent that friable material as well as a nonfriable Category I asbestos-containing material that has been subject to certain forces are separately addressed in the regulations. We therefore agree with the State that the question before the court should not have been reduced solely to whether the floor tile had been rendered friable by Titan's removal activity. The floor tile could also have been subject to the emission control and disposal procedures if it were subjected to grinding, as the State claimed, even if it were not friable as a result of cutting, grinding, sanding, or abrading.

{¶ 33} The State further argues that the trial court should have found, as a matter of law, that the floor tile at Cleveland Elementary School had been subjected to grinding based on the court's finding that "pieces of tile broke into small pieces." "Grinding" means "to reduce to powder or small fragments and includes mechanical chipping or drilling." Ohio Adm. Code 3745-20-01(B)(24).

{¶ 34} Although the State emphasizes that the trial court found that the floor tile was broken into small pieces, the trial court's findings were more varied. The trial court initially stated that "[i]n the process of removing this floor tile from the concrete floor, the tile broke or cracked in pieces. Some of the floor tile broke into large pieces and other pieces of tile broke into small pieces." Discussing Sink-Gostomsky's site investigation, the trial court found that she saw floor tile that was "cracked" and in "many pieces" and that she

observed "damaged floor tiles of many different sizes."   In its conclusions of law, the court again noted that "[t]he resilient floor tile was broken into many pieces when Defendant scraped it off of the concrete floors at the Cleveland Elementary School."   The court ultimately concluded that the floor tile had not been subjected to sanding, grinding, cutting, or abrading.

{¶ 35}   Stated generally, the trial court found that Titan's scraping of the floor tile from the cement underlayment resulted in broken tiles of various sizes.   It did not find that the floor tile was broken into small fragments or powder, nor did its findings suggest that the overwhelming majority of the broken tile constituted small fragments or powder.   We cannot reasonably infer such a finding based solely on the phrase that some of the "pieces of tile broke into small pieces."   Whether the trial court's findings are against the manifest weight of the evidence was raised in the State's third assignment of error, and that issue will not be addressed here.   Given the trial court's findings, we find no basis to conclude that the trial court should have concluded, as a matter of law, that the floor tile was subjected to grinding during the pre-demolition removal of the floor tile.

{¶ 36}   The State's first assignment of error is overruled.

IV.

{¶ 37}   The State's second assignment of error reads:

THE TRIAL COURT ERRED AS A MATTER OF LAW IN REQUIRING THAT FRIABILITY BE DETERMINED BY APPLYING HAND PRESSURE IN A SPECIFIC MANNER

{¶ 38}   In its second assignment of error, the State contends that the trial court

improperly concluded that the regulations required a specific hand pressure test to determine friability. The State argues that the EPA has never expressly defined what is intended by the term "hand pressure," and the EPA guidance documents are merely suggestions as to how that term should be applied. Titan responds that any error by the trial court regarding its hand pressure analysis would be harmless, because the State did not establish that the floor tiles were friable, regardless of the test that was used.

{¶ 39} At trial, Sink-Gostomsky testified that she rubbed her finger along the edge of the floor tile samples, which she considered to be a hand pressure test. She stated that rubbing on the edges can show that there is powder on the material, and that the edges of the Cleveland Elementary School floor tile were reduced to powder by hand pressure. Estep did not do a hand pressure test; he stated that he was certain "by visual representation" that the floor tile was friable.

{¶ 40} Thomas Buchan, Ohio EPA's Asbestos NESHAP Coordinator in the Division of Air Pollution Control, Air Toxics Unit, testified that a material is friable if it is damaged to the extent that there is a significant chance for potential for fiber release. He stated that friability can be determined either by hand pressure or "if it's extensively damaged enough that it exposes areas where * * * the fibers are like that, then the disturbance of that material will significantly increase the chance for fiber release." Buchan stated on redirect examination that rubbing on the edges to determine whether there is potential release of fibers constitutes hand pressure.

{¶ 41} Titan's expert, Wayne Ingram of Training Services International ("TSI"), a company that provides asbestos regulation training to the regulated community and

government entities, testified that friability is determined by a hand pressure test. He stated that EPA guidance documents indicate that an inspector should put the material into a ziplock bag and try to crush it with hand pressure; "you basically squeeze the material and see if it easily crumbles or pulverizes." Ingram stated that "hand pressure" is the only test given to determine the friability of Category I asbestos-containing materials; however, EPA guidance documents indicate that a finger edge test is part of applicable tests for Category II asbestos-containing materials.

{¶ 42} The December 1990 Asbestos/NESHAP Regulated Asbestos Containing Materials Guidance (EPA-340/1-90-018) provided "recommendations" for complying with the asbestos NESHAP regulations, and it included guidelines for determining friability. In the General Inspection Procedures section, the guidance document suggests to collect a piece of dry ACM and seal it in a transparent, reclosable sample bag, apply hand pressure and observe if the ACM falls apart to the extent that it is crumbled, pulverized, or reduced to powder. As to resilient floor tile specifically, the document recommends looking to see if the tile is in poor condition and, if so, collecting a representative sample, sealing it in a sample bag, and applying hand pressure.

{¶ 43} With respect to Category II nonfriable asbestos-containing material, such as asbestos cement pipe and sheet products, the 1990 guidance document notes that "[b]roken edges of these material typically are friable. The fractured surface should be rubbed to see if it produces powder."

{¶ 44} The December 1990 guidance document acknowledges that the recommendations "are not the exclusive means of complying with the Asbestos NESHAP

requirements," and that "[f]ollowing these recommendations is not a guarantee against findings of violations." Nothing in the 1990 guidance document precludes rubbing the edge of Category I nonfriable asbestos-containing material if it appears that the broken edge may be friable, but there are no specific suggestions recommending such action. This may be based on the EPA's statements in the preamble to the November 1990 regulations that "materials such as resilient floor coverings * * * would rarely, if ever, need to be removed because, even when broken or damaged, they would not release significant amounts of asbestos fibers."

{¶ 45} In its conclusions of law, the court discussed the testimony, regulations, and guidance documents regarding the manner of conducting a hand pressure test.

The Defendant argues that with regard to this critical issue [i.e., friability,] the hand pressure test, as set forth in the EPA publication, is required. The Plaintiff agrees there needs to be a hand test but does not agree that the inspection procedures set forth in the EPA publication is [sic] the exclusive required method. Plaintiff asserts the "edge test", is equally valid.

Neither party has cited a statute, regulation, or case that mandates a particular method. The court is persuaded that on this important issue the procedure set forth in the EPA publication should be followed. Although the regulations appear to permit some subjectivity, the court feels that it is not unbridled subjectivity that should prevail. Of the two alternatives to triggering the requirement of various containment procedures, all are best served by some observance of a standard. It should not be a situation of an inspector, even though well trained and very experienced, just saying there are too many edges and thus the pieces are friable. An inspector should be required to take a piece of dry tile and seal it in a transparent, reclosable sample bag, apply

hand pressure and observe if the tile falls apart to the extent that it is crumbled, pulverized, or reduced to powder.

The court realizes that this may be an attempt to draw a fine line in various gradations or degrees, but it provides some moderate reasonable objectivity.

* * *

As indicated, the test for friability involves two determinations. First, had the asbestos-containing material when dry become crumbled, pulverized, or reduced to powder. One determines that when using hand pressure on the substance and seeing if it will crumble, pulverize, or be reduced to powder. The second question is whether the floor tile has been subject to cutting, grinding, sanding or abrading. Plaintiff failed to produce, in this case, evidence of cutting, grinding, sanding or abrading.

Plaintiff, with some credibility, points to the many pieces of floor tile in the photographs. The Plaintiff further had evidence that one of the inspectors had used her hand on the edges of the tile pieces and fragments came loose. Finally, Plaintiff points to the fact that there were so many pieces and that with that many edges exposed the likelihood of asbestos fiber release was great.

The Defendant stresses the lack of a test here. The Defendant emphasizes that the inspectors never engaged in the procedure suggested by the EPA to determine friability of floor tile. The Defendant stresses the general nature of resilient floor tile, that is, that if it is intact, not in poor condition, it is not likely to release a significant amount of asbestos fibers.

The court has employed the test for determining credibility of the witnesses. The court considers the appearance of each witness upon the stand; his or her manner of testifying; the reasonableness of the testimony;

the opportunity he or she had to see, hear and know the things concerning which he or she testified; his or her accuracy of memory; frankness or lack of it; intelligence, interest and bias, if any; together with all of the facts and circumstances surrounding the testimony. Considering the credibility of the witnesses, the exhibits, testimony and all the facts and circumstances in evidence, it is reasonable to conclude that Plaintiff has not established by a preponderance of the evidence that the floor tile became friable. Therefore, the asbestos NESHAP was not triggered. Defendant did not have to comply with the NESHAP procedures under these circumstances.

{¶ 46} The trial court acknowledged that the hand pressure test had not been described in the regulations and that no statute or regulation mandates a particular method. Although the trial court stressed a strong preference that the hand pressure test be applied in the manner described by the guidance documents to provide some objectivity and uniformity to the determination of friability, the trial court did not require Sink-Gostomsky, Estep, and other asbestos inspectors to apply a particular hand pressure test. And at the end of its conclusions of law, the trial court expressly indicated that it had determined whether Titan was subject to NESHAP regulations by weighing the credibility of the parties. There is no suggestion that the trial court's finding regarding the friability of the floor tile was based solely on the fact that Sink-Gostomsky and Estep had not performed a hand pressure test by placing their samples in plastic bags and attempting to crush the samples with their hands. The trial court did not conclude that the hand pressure test, as set forth in the regulations, was required to determine whether a material is friable.

{¶ 47} The State's second assignment of error is overruled.

V.

{¶ 48}   The State's third assignment of error states:

THE TRIAL COURT'S RULING WAS AGAINST THE MANIFEST
WEIGHT OF THE EVIDENCE.

{¶ 49}   In its third assignment of error, the State argues that the trial court erred in stating that the central issue in the case was whether the floor tile was friable; the State claims that the relevant issue was whether the floor tile was RACM. The State further asserts that the trial court should not have relied on guidance documents that refer to razing operations, as Titan was removing floor tile prior to demolition. Finally, the State contends that the trial court's findings that the floor tile had not been subjected to grinding and was not friable were against the manifest weight of the evidence. The State asserts that the manifest weight of evidence supports the conclusion that the Cleveland Elementary School floor tile was RACM and that Titan was required to comply with the NESHAP regulations.

{¶ 50}   The central issue in this case was not whether Titan was required to remove the floor tile prior to demolition. There was no evidence that the Cleveland Elementary School floor tile was in poor condition and friable prior to Titan's decision to remove the tile, and the trial court found accordingly. It was undisputed that Titan decided to remove the floor tile so that it could recycle the concrete underlayment.

{¶ 51}   The State proceeded on the theory that, having elected to remove the floor tile, Titan's method of removal caused the floor tile to become RACM and subject to NESHAP regulations. The principal issues involved in that determination were whether the floor tile had been rendered friable or whether it had been or would be subjected to grinding, sanding, cutting or abrading. (The State focused on grinding.) Regardless of how the trial

court framed the issue, the trial court found that the broken floor tile was not friable and that there was no evidence of grinding. We therefore focus on whether the trial court's findings regarding friability and grinding were against the manifest weight of the evidence.

{¶ 52} The weight to be given the evidence and the credibility of the witnesses are primarily matters for the trier of fact to determine. *In re Guardianship of Smith*, 2d Dist. Clark No. 09 CA 69, 2010-Ohio-4528, ¶ 19, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The court of appeals has an obligation to presume that the findings of the trier of fact are correct. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. "This presumption arises because the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' * * * 'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" (Internal citations omitted.) *Id.* We will not reverse the trial court's findings "if there is some competent, credible evidence" to support them. *See C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 53} The State's evidence on the friability of the floor tile focused on the condition of the floor tile after its removal by Titan. Sink-Gostomsky testified that she observed "a few [floor tiles on the first floor that] were 9-by-9, full size. But I would say the vast majority, 80, probably 90 percent of it were in small pieces; anywhere from the size of your hand, down to lots of pieces that were smaller than a dime, to just little chips of it."

On the second floor, she also saw "extensively damaged" floor tile, which were so numerous that she "couldn't even count the number of pieces that it would take in order to be a 9-by-9 floor tile. They were very small, probably, like I said, anywhere between, you know, the size of your hand, quarter, nickel, dime, and smaller." Sink-Gostomsky saw dust and debris everywhere, and she acknowledged on cross-examination that the dust could have emanated from wallboard, ceiling tile, or other construction debris.

{¶ 54} Sink-Gostomsky explained that breakage leads to the release of fibers, the hallmark of friability. She stated,"Every time there is a crack or break in the tile, the edges of where that breakage is, asbestos fibers can be released from that breaking, that breakage. So if you have a tile that's been extensively damaged, it's in small, little fragments, each little piece, every edge of each individual piece can release asbestos fibers into the air."

{¶ 55} Sink-Gostomsky said that she considered the floor tile to be friable and regulated. On cross-examination, she testified that she felt each of the pieces she sampled and rubbed her finger across the edge to see if there was "powder on the material." On redirect examination, Sink-Gostomsky stated that the edges of the floor tile reduced to powder by hand pressure. She testified that the floor tile on both levels of the building "had been rendered substantially non-intact and friable by whatever removal efforts were being utilized to remove the floor tile from the concrete."

{¶ 56} Estep, the ODH inspector, testified that material is friable when it "has been rendered into small, potentially airborne or substantially non-intact pieces." With respect to floor tile, he testified on cross-examination that breakage into three pieces would render the floor tile airborne or potentially airborne. He stated that the condition of the material would determine whether the material was friable, and that friability was a "visual determination." Estep did not do a hand-pressure test at Cleveland Elementary

School, because he was certain "by visual representation" that the floor tile at the school was friable.

{¶ 57} Buchan also testified that an investigator would know if Category I ACM had become subject to regulation "by the condition of the material." He stated that it was the extent of the damage that made the floor tile friable and that the extensive damage to the Cleveland Elementary School floor tile had caused it to become RACM. Buchan explained that Category I nonfriable asbestos-containing material in good condition does not have to be removed before demolition, but if a contractor decides to remove the flooring, "you can't deliberately cause it to become friable. You have to remove it in an intact or a nonfriable state and it has to remain that way all the way through removal to disposal."

{¶ 58} Buchan testified that one way floor tile can become RACM is if it is broken into small pieces. He believed that if tile broke into pieces the size of a quarter or less it would be significantly or extensively damaged and thus subject to regulation Buchan stated that floor tile is friable if it is damaged to the extent that there is a significant chance for potential for fiber; he indicated that the potential for fiber release is determined on a case-by-case basis by looking to see if the material's bonds are broken and fibers are exposed. During cross-examination, however, Buchan acknowledged that "extensively broken" is not a term used in the NESHAP final rule, that the rule does not define broken floor tile of a particular size or in a particular number of pieces as friable, and that the rule defines friable material as material that "can be crumbled, pulverized, or reduced to powder by hand pressure."

{¶ 59} Ingram testified that the EPA had used the term "broken" in the 1980s, but

the 1990 rules decided to go back to using crumbled, pulverized, or reduced to powder to define friability. Ingram stated that if floor tile is broken during demolition, "[i]t is just a smaller piece of floor tile"; in his opinion, broken floor tile did not become RACM. Upon reviewing the photos taken by Sink-Gostomsky and Estep at Cleveland Elementary School, including the photos of the tile, the debris piles, and the bobcat on site, Ingram opined that there were no tools that would have caused the floor tile to become RACM. He testified that the photos showed broken tile, but the material did not become friable during removal by Titan. Ingram stated that resilient floor in good condition remains very flexible and that risk from the flooring is "very, very low." He indicated that resilient floor tile would not crumble just because it was 53 years old. Ingram testified that the removal of the floor tile prior to ultimate demolition is not subject to NESHAP procedures as long as the tile was not sanded, grinded, cut, or abraded.

{¶ 60} Ristich testified on cross-examination that the floor tile samples collected by RAPCA had been described by a Data Chem analyst as being "solid, compact materials." Ristich stated that based on that description she would say that the floor tile was nonfriable.

{¶ 61} State's Exhibit 23, which was the EPA's September 1992 manual entitled "Demolition Practices Under Asbestos NESHAP," addressed pre-demolition floor tile removal and commented that a "wide variety of floor removal methods exists, some of which cause the floor tiles and mastic to become RACM and subject to the provisions of the asbestos NESHAP." The manual described various methods, indicating that "where breakage is extensive, the tiles are RACM and are subject to the provisions of the asbestos NESHAP."

{¶ 62}  In July 1994, the EPA responded to a letter requesting a re-evaluation of the guidance on floor tile under the asbestos NESHAP, specifically the use of the phrase "extensive breakage" as a criterion for judging if the floor tile had become regulated.  The EPA responded that the use of "extensively damaged" was appropriate as nonfriable material has the potential for significant fiber release if extensively damaged.  The response noted that the preamble to the November 1990 NESHAP regulations explained that "most nonfriable material can be broken without releasing significant quantities of airborne asbestos fibers.  It is only when the material is *extensively damaged, i.e., crumbled, pulverized or reduced to powder*, that the potential for significant fiber release is greatly increased."  (Emphasis added.)  The response letter thus indicates that "extensively damaged" requires damage such that the material is crumbled, pulverized or reduced to powder.

{¶ 63}  Upon review of the testimony and exhibits presented at trial, the State's evidence regarding friability was based primarily on the fact that the floor tile had been broken into numerous pieces, including many pieces that were smaller than a dime.  The State's witnesses testified that the floor tile was "extensively damaged," which greatly increased the risk that asbestos fibers would become airborne.  Sink-Gostomsky had run her finger along the edge of the tile that she collected and noticed that particles or fibers came loose.  She acknowledged, however, that the extensive amount of dust at the site could have come from other demolition debris.  The photos taken by Sink-Gostomsky and Estep substantiated that the floor tile was not removed intact and that the floor tile was broken into numerous pieces of varying sizes.  The State's witnesses believed that the floor tile had

been rendered friable.

{¶ 64} On the other hand, Titan presented evidence that the mere breakage of floor tile does not render the floor tile RACM, and the trial court expressly found that "[b]reaking a floor tile alone is not enough for fiber release." Ingram had reviewed the photos offered by the State and saw that there was broken tile, but he did not believe that the floor tile had become friable by Titan's removal activities and he did not believe the age of the tile required a conclusion that it would become friable. The photos reflected many pieces of "non-intact" tile of various sizes, including many small pieces, but it is not evident from the photos that the pieces of tile could be crumbled, pulverized, or reduced to powder. The condition of the RAPCA floor tile samples, as noted by a Data Chem analyst, also supported the conclusion that the floor tile was not in such a condition that it could be crumbled, pulverized, or reduced to powder by hand pressure.

{¶ 65} The trial court had the opportunity to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the testimony. See *Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. There was conflicting evidence as to whether the floor tile had become friable, and we will not reverse the trial court's finding on friability based solely on the ground that the trial court could have reasonably found otherwise. The trial court's conclusion that the floor tile was not rendered friable was supported by competent, credible evidence.

{¶ 66} We further find that the trial court's finding that the floor tile was not ground is not against the manifest weight of evidence. Sink-Gostomsky and Estep both testified that they believed Titan had ground the floor tile prior to their arrival based on the condition

of the floor tile. As stated above, Sink-Gostomsky testified that 80 to 90 percent of the floor tile was in small pieces, with the size ranging from "the size of your hand, down to lots of pieces that were smaller than a dime, to just little chips of it." The State's witnesses concluded that the floor tile had been reduced to small fragments, per the definition of grinding, as a result of its removal with the bobcat. They emphasized that grinding is determined by the resulting small fragmentation of the floor tiles, not by the means that were used to cause the damage.

{¶ 67} Ingram testified, however, that he had reviewed the photos of the site and did not see any evidence of grinding. He indicated that resilient floor tile will score and break, but breakage is not sanding, cutting, grinding or abrading. He further expressed that using a bobcat to scrape off floor tile and push it into piles does not result in regulation under NESHAP.

{¶ 68} Whether the floor tile had been reduced to powder or small fragments, such that it met the definition of "grinding" under Ohio Adm. Code 3745-20-01(B)(24), was a question of fact to be determined by the trial court based on all the evidence before it. As stated by the trial court, some of the floor tile had broken into large pieces and other pieces of tile broke into small pieces. The State's witnesses emphasized the numerous small pieces of floor tile at Cleveland Elementary School, whereas Titan's expert indicated that the photos did not establish that the floor tile had been ground. The trial court weighed the evidence and concluded that the State had not established, by a preponderance of the evidence, that the floor tile had been subjected to grinding. The trial court's finding was supported by competent, credible evidence, and we will not reverse it.

{¶ 69}   The State's third assignment of error is overruled.

VI.

{¶ 70}   In its brief, Titan raises a cross-assignment of error, which states:

THE TRIAL COURT ERRED BY FAILING TO FIND THAT THE STATE

FAILED TO PROVE THAT THE FLOOR TILES AT ISSUE WERE

"CATEGORY I NONFRIABLE ASBESTOS-CONTAINING MATERIAL."

{¶ 71}   In its cross-assignment of error, Titan argues that we should affirm the trial court on the additional basis that the State failed to prove that the floor tile contained more than one percent asbestos.   It emphasizes that Data Chem did not conduct PLM point counting and thus claims that the tiles were never shown to be Category I nonfriable asbestos-containing material in the manner required by the regulations.

{¶ 72}   In light of our disposition of the State's assignments of error, Titan's cross-assignment of error is overruled as moot.

VII.

{¶ 73}   The trial court's judgment will be affirmed.

. . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Wednesday M. Szollosi
Gregg H. Bachmann
Ronald J. Kozar
Hon. Timothy N. O'Connell